[No. 2416.]

## JESSE BROTHERS v. THE STATE.

1. THEFT—RECEIVING STOLEN PROPERTY—INDICTMENT.—To charge the receiving of stolen property, knowing it to be stolen, the indictment need not allege the facts going to constitute theft against the original taker from whom it has been received. See the opinion on the question.
2. SAME—PRACTICE.—PLEA OF AUTREFOIS ACQUIT, showing upon its face that there was no identity of the former case and that on trial it was properly *held* bad on demurrer.
3. EXCULPATORY EXPLANATION OF RECENTLY STOLEN PROPERTY—BURDEN OF PROOF.—When a party in possession of recently stolen property gives an exculpatory explanation of his possession which is reasonable or probable, then the burden devolves upon the State to prove its falsity, otherwise the accused is entitled to an acquittal.
4. RECEIVING STOLEN PROPERTY, ETC.—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a conviction for receiving stolen property, knowing it to be stolen, because insufficient to establish the essential element of guilty knowledge beyond a reasonable doubt.

APPEAL from District Court of Falls. Tried below before the Hon. Eugene Williams.

The conviction in this case was for receiving stolen property, knowing the same to be stolen. The penalty assessed against the appellant was a term of two years in the penitentiary.

H. C. Osborne was the first witness for the State. He testified that he lived on Mustang Prairie, in Falls county, Texas, during the greater portion of the year 1883. In October of that year he moved from Mustang Prairie to the west side of Big creek, in the same county. At the time of the witness's said removal he had in his possession two cows, each with a calf, one of which cows, with her calf, belonged to the witness, and the other cow and calf to Mr. Waters, who lived near the witness. The last mentioned animals were in the possession of the witness and in his care and management for the said owner. The Waters calf or yearling was neither marked nor branded. That yearling and its mother ran in the witness's field until some time in December, 1883, when the witness turned the yearling out and it disappeared from the range about a week before the Christmas of that year. Diligent search and inquiry failed to discover it On the tenth or twelfth of February, 1884, the witness in company with Thomas Brooks and Jeff Parton, was going down Blue Ridge, on the east side of Big creek from Blalock's mill, when he saw a bunch of cattle approaching him and his companions, driven by two men. After taking a good look at the bunch of cattle the witness remarked to Brooks and Parton that he thought he recognized his own and the Waters yearlings in that bunch, and he according left Brooks and Parton and started in a gallop towards the cattle. About the time he left Brooks and Parton one of the men driving the cattle, whom the witness has since known as the defendant, but whom he did not then know, left the cattle and rode in the direction from which witness was approaching the bunch. They passed each other on the road. When witness reached the bunch of cattle they had been turned out of the road as if to go around Mr. Stone's pen, and were being held against the pen by Mr. William Brothers, who was also a stranger to the witness at that time. Witness found his own and the Waters yearling in the bunch. Witness asked William Brothers who owned that bunch of cattle, and he said that they were owned by Jesse Brothers. In a short while defendant came back to the bunch, accompanied by Brooks and Parton, and the witness asked him if he claimed those cattle, and he replied that he did. The witness then asked him where he got them, and he said that he bought them. Witness asked him whom he bought them from, and if he made any reply to that question the witness did not hear him. The witness then pointed out the two yearlings to defendant, and told

him that they belonged to him, and asked him if he wanted witness to prove them. Defendant said that he did, and witness told him that he could prove them by twenty men. The defendant then asked Brooks and Parton if witness was a responsible man, and being affirmatively answered by those gentlemen, defendant replied that witness could take the yearlings. The yearlings when recovered by the witness bore the brand D8, the brands being apparently about six weeks old. Witness placed the two yearlings in Mr. Stone's lot and afterwards went back and got them and took them home and turned them into his field. He then notified J. W. Waters, who came to witness's house, and Waters's animal was put in his brand, which was W6. The two yearlings were found in the defendant's possession in Falls county, Texas, and previous to their disappearance they ranged in Falls county, Texas. Witness did not give his consent to the defendant to take those yearlings. The witness did not know one Mat Roberts at the time he recovered the yearlings described.

Cross examined, the witness stated that he met the defendant with the animals between nine and eleven o'clock in the day time, and on a much traveled public road, and it was on Saturday, which was "mill day." Witness did not claim the yearlings until after he had asked the defendant whom he had bought the cattle from. The defendant's counsel asked the witness at this point, if, when he asked the defendant whom he bought the cattle from, the defendant did not say: "From a man across the creek," and did not witness then ask him: "From Mat Roberts?" The witness replied that he did not think such a conversation occurred. The defendant's counsel then read from the witness's statement before the examining trial as follows: "I asked the defendant if he got the yearlings from Mat Roberts. I am not positive whether he replied or not," and asked witness if his statement on the examining trial was not more likely to be correct on that point than his present statement; to which question the witness replied in the affirmative. Continuing, the witness said that he did not learn, until fully thirty minutes after his conversation with the defendant at the herd, that he, defendant, claimed to have obtained the cattle from Mat Roberts. The Waters yearling was calved in February or March, 1883. A calf became a yearling at the age of twelve months. It was usually called a yearling from the time it quit sucking, which was generally at the age of from ten to twelve months.

Thomas Brooks testified, for the State, that he and Jeff Parton were with the State's witness, Osborne, on the morning when Osborne found his two yearlings in the herd of cattle in the possession of the defendant. The bunch of cattle, when first seen by the witness, were in the act of being turned from the public road on the Big Creek side in the direction of Mr. Stone's mill. The distance at which the parties first discovered the herd was so great that they could not recognize the parties having it in charge. Osborne presently remarked that he thought he recognized two of his yearlings in the bunch, and rode off towards the bunch at a rapid gait. About the time that Osborne left witness and Parton, the defendant left the herd, coming towards them. He met and passed Osborne, and came up to the witness and Parton, and stopped. During the conversation which ensued, some one with the cattle called, and witness, Parton and defendant went to the cattle. When they arrived, Osborne asked the defendant if he claimed the cattle, and he replied that he did. Osborne asked him where he got them, and he said that he bought them. Osborne then asked him whom he bought them from and he replied that he bought them from a man across or up the creek. Osborne again asked him whom he bought them from, and if the defendant replied the witness did not hear him. Witness was then near the parties and felt satisfied that he would have heard the defendant had he replied to Osborne's last question. Osborne claimed two of the yearlings, and defendant told him that he would have to support his claim by proof, and Osborne told him that he could prove them by twenty people if necessary. Defendant then turned to witness and asked if Osborne was a responsible man. Witness replied that Osborne was a thoroughly responsible man, and that he had no manner of doubt that the yearlings belonged to Osborne. The defendant then said that Osborne could take the animals. The defendant and Osborne and witness then placed the yearlings in Stone's pen, and the whole party rode off towards the house of the defendant's mother, about a half mile away. At a point about half way between Stone's pen and his mother's house the defendant told the party that he got the yearlings from Mat Roberts. The two yearlings, when recovered, were in a mark not now remembered by the witness, and were branded D8, which brands appeared to be about six weeks old. Jeff Parton testified, for the State, substantially as did the witness Brooks.

J. W. Yates testified, for the State, that when Osborne moved from Mustang Prairie to his present residence on Big Creek, in the fall of 1883, he helped him to drive two cows and calves and a yearling from the one place to the other. The two calves were then unbranded. When witness saw them as yearlings in February they were branded D8. Witness knew those two yearlings to be Osborne's two calves.

J. W. Waters testified, for the State, that the State's witness, Osborne, had in possession, in 1883, a cow and calf belonging to the witness. Some time in February, 1884, witness was sent for by Osborne and on his arrival at Osborne's house found his calf, then a yearling, in the D8 brand. He and Osborne put witness's brand on the yearling. Witness never gave his consent to the defendant or anybody else to take that animal. Witness knew Mat Roberts, who, in 1883, lived two or three miles from Osborne's house. Mat Roberts, whose brand was HA with an over bar, may have owned a few cattle. Witness was a stock man of long residence in Falls county, and had a general and intimate acquaintance with marks and brands over the county. He had never known any one in Falls county who gave the D8 brand. He had never seen that brand before nor since he saw it on his yearling. A yearling is properly an animal of the cattle species, twelve months old, but young cattle from ten to twelve months old are called yearlings. A cattle man buying yearlings would expect and endeavor to get animals between one and two years old, and a cattle man selling yearlings would deliver them at any age he could. The State closed.

Mrs. Williams, the mother of the defendant, was his first witness. She testified that the defendant lived with her in 1883 and 1884. Early in February of the last mentioned year one Mat Roberts came to witness's house and asked the witness for the defendant. Witness told him that the defendant was not at home, and he said that he had come to see if defendant was still buying cattle, as he, Roberts, had a few head to sell. The witness told Roberts that defendant would be at home some time during the day and that she would report his, Robert's, visit to him. Witness then asked him to tell her what kind of animals he had, so that she might tell her son, the defendant. Roberts said, as well as witness could remember, that he had three two-year-olds in the old Forbes pasture. When defendant got home on that same day she told him of Roberts's visit, and defendant

said that he had not filled the contract he then had and would buy them.

Roberts came to the house again in a day or two, and he and defendant traded, defendant buying the yearlings. The witness was in and out of the room during the transaction between defendant and Roberts, but could not say that she was in the room all of the time. She remembered that defendant called witness and told her that he wanted some money. Witness got the money for defendant and he handed it to Roberts. As well as the witness could remember, she gave defendant forty dollars, which amount defendant gave to Roberts, and was to pay Roberts, in addition to that money, thirty bushels of corn, for the animals. The corn was then at the witness's place, and Roberts was to come for it. Roberts never came for the corn. Witness saw the yearlings as they were driven past her house on the day that two of them were proved away from defendant, but she took no special notice of them, and could not describe them. Witness's son Taylor Brothers, and her young daughter, were at the house when the defendant bought the cattle from Roberts.

On or about the first day of January, 1884, a man who said that his name was Webb came to the witness's house and asked permission to pen his cattle for the night in the witness's field, and witness gave him the desired permission. Webb was evidently a mover. He had two ladies with him, one of whom he called his mother. The witness took the other to be his sister. The latter was apparently a widow, and had two children. They were traveling in a wagon driven by another man. Webb claimed to be from Leon county, and said that he was going west. He and his people spent that night and the next day at the witness's house. On the day after Webb's arrival at witness's house, Mat Roberts came to that house, and he and Webb had some kind of a trade, the particulars of which the witness did not know, beyond the fact that cattle was the subject matter. Defendant may have been, and witness thought was, about the place, but not in the room when the cattle trade was made between Webb and Roberts. Webb's cattle were in the witness's field, but witness did not observe their brands. They numbered between twenty-five and thirty head, and appeared to be stock cattle. On her cross examination witness said that a bill of sale was spoken of at the time of the trade between Roberts and defendant, but none was executed because the only pen and ink owned by any of the parties were then at the school house.

Taylor Brothers testified, for the defense, that he was at the house of his mother, Mrs. Williams, in Falls county, Texas, early in January, 1884, when a man named Webb, another man who called himself Parker, two women and two children came to the house of Mrs. Williams. Webb put a bunch of cattle in Mrs. Williams's field. The witness knew nothing about the purchase of cattle from Webb by Roberts. The witness was at Mrs. Williams's house on or about February 10, 1884, when defendant bought five head of cattle from Roberts, three two year olds, at thirteen dollars per head, and two yearlings at eight dollars per head. Forty dollars were paid to Roberts in money by defendant, and defendant was to pay the balance in corn at fifty cents per bushel. The animals were sold to defendant on the range, Roberts telling him that they were in Forbes's pasture. A bill of sale was spoken of, when witness suggested that one or two witnesses were as good as a bill of sale, and none was executed. When Roberts told defendant that the animals were in Forbes's pasture, defendant remarked that he had seen them there, and had been inquiring who owned them. Defendant and Mat Roberts were well acquainted, having lived in the same neighborhood for many years. The witness did not remember that the reason a bill of sale was not drawn up was that the pen and ink were at the school house.

James Martin testified, for the defense, that, returning to his home from a party one day early in January, 1884, he went by Mrs. Williams's house to see about a cow he had. Witness went first to the lot, in which he found his cow, and then into Mrs. Williams's house to warm his hands and get a rope. Mat Roberts, a man who called himself Webb, and two women were then in the room. Roberts asked witness to sign a paper for him as a witness. Witness, thinking the paper was a bill of sale, signed it without looking at it, or hearing it read. Witness was in the house but a minute or two. He heard nothing said about a trade, nor did he ever see the paper again until he saw it on the witness stand while testifying in the case of The State v. Mat Roberts. Witness then recognized the paper he had signed as a witness at Mrs. Williams's house, and saw that it was a bill of sale describing five head of cattle branded D8. The witness could not now remember the sex of the different animals as stated in that bill of sale, nor, with any degree of certainty, the ages stated therein, but his recollection was that some were described as yearlings and others as two year olds.

The witness was acquainted with Mat Roberts when he signed the bill of sale as a witness, in the manner stated. Witness at that time saw from twenty-five to thirty-five head of cattle in Mrs. Williams's field, and observed the letter D branded on some of them, but noticed no other brand. The brands observed by witness were on grown cattle. When the witness signed the bill of sale, the defendant was at the horse lot. Witness did not know whether the defendant spent the previous night at home or not. He and the witness attended a party together on that night, and the witness slept at a house not far from Mrs. Williams's. It was the recollection of the witness that William Brothers was in the room when witness signed the bill of sale. Witness then saw that Webb had some money in his hands. Webb was a light complected young man, not over twenty-five years of age. Witness recognized the bill of sale on the Mat Roberts trial only by his signature.

John N. Wharton testified, for the defense, that he was the defendant's attorney in this case. He once had in his hands a bill of sale which was signed by James Marlin and William Brothers as attesting witnesses. Witness gave that bill of sale to the attorneys in the Mat Roberts case, and had not seen it since. Witness had applied to those attorneys often for that bill of sale, but had been informed by them that, after diligent search, they had failed to find it. He knew that those attorneys had searched for that paper. That bill of sale purported to have been executed by one Webb to Matt Roberts, conveying three two year old and two one year old cattle, branded D8.

William Brothers testified, for the defense, that some time in February, 1884, the defendant requested him to go with him and help gather some cattle he had bought from Mat Roberts. Witness and defendant found those cattle, five in number, in Forbes's old pasture, and started with them to Mr. Stone's house, where defendant had another animal that he had purchased from Stone. At a point opposite Stone's house, they deflected a little from the road to go to Stone's pen, when they observed some one at a well nearly on the route they were going. Defendant remarked that he thought that person was Stone, and that he would go and see him, and rode off in that direction. While defendant was gone, a man came to witness, who was holding the cattle, and asked witness who claimed those cattle. Witness told him that the defendant claimed them. Defendant soon returned, Messrs. Brooks and Parton reaching the herd about

the same time. Osborne, then a stranger to witness, asked the defendant if he claimed those cattle. Defendant replied that he did. Osborne then asked him where he got them, and defendant replied that he bought them from a man over the creek. Osborne asked: "Mat Roberts?" Defendant replied in the affirmative. Osborne then said: "I thought that d—d rascal had my cattle, but now I have found out better." Osborne then claimed two of the yearlings in the bunch, and defendant said that he would have to prove them. Osborne said that he could do that by twenty men. Defendant then asked Brooks if Osborne was a responsible man. Brooks replied that he was, and defendant surrendered the yearlings, and they were penned at Stone's. The other cattle were then turned loose upon the range, defendant declaring that he would have nothing to do with them. The conversation between Osborne and defendant was conducted in a loud tone of voice, and could have been heard by all parties present.

Jesse Hunnicutt testified, for the defense, that some time in February, 1884, Mat Roberts employed him to go to Mrs. Williams's house with a wagon and team, to get a load of corn which he said the defendant owed him. On his way to Mrs. Williams's he met defendant, who told him that Mat Roberts could not get the corn, as the cattle had been taken away from him. He then asked witness where he could find Mat Roberts. Witness did not get the corn. He did not know whether defendant saw Mat Roberts on that day or not.

William Stone testified, for the defense, that he lived on Blue Ridge, in Falls county, Texas, in 1883 and 1884. Some time before February 12, 1884, the witness sold the defendant a yearling which was not delivered, but which defendant was authorized to get, at his house, at any time he called for it. Witness was not at home on the day that Osborne took the two yearlings from the defendant.

Mr. Brady testified, for the defense, that in 1883 he lived in Leon county, Texas, and knew one Hugh Webb, a light complexioned man between twenty and twenty-five years of age. Some time in the fall or winter of 1883 Webb sold out and moved away. The witness understood that he left by private conveyance. Witness did not know whether or not Webb owned cattle, nor whether or not he had a brand.

James Brady testified, for the defense, that he lived in Leon county and knew the Hugh Webb spoken of by Mr. Brady.

Webb had a mother, and a widowed sister with two children, who went with him when he moved from Leon county, late in 1883. A man named Parker also went with him. Webb owned a small stock of cattle, which he took with him. He moved off in wagons, saying that he was going west. Witness did not know Webb's brand. Defense closed.

Mack Waters testified, for the State, in rebuttal, that some time before Christmas, 1883, he and Mat Roberts, in passing, observed two yearlings in Osborne's field. Mat Roberts remarked that "there were two yearlings which could be easily gotten away with." The witness told him that one of those yearlings belonged to Osborne and one to J. W. Waters. The defendant was not then present. Those yearlings were the same two afterwards recovered by Osborne from defendant.

The special plea of autrefois acquit, referred to in the second head note of this report, reads as follows:

"Defendant avers that hertofore, to wit, on the twenty-seventh day of January, 1886, by a valid indictment presented in the district court of Falls county by a lawfully constituted and organized grand jury, this defendant was charged in one count of said indictment with the theft of a certain yearling neat cattle which said yearling is alleged to be the property of H. C. Osborne, and which said theft is alleged to have been committed in Falls county, on or about the twenty-fourth day of December, 1883, and in another count this defendant is charged with fraudulently receiving said yearling neat cattle as aforesaid from one Mat Roberts, knowing it to have been stolen, who is alleged to have stolen said yearling from said H. C. Osborne, which said fraudulent receiving as aforesaid is alleged in said second count of said indictment to have been committed in Falls county, Texas, on December 24, 1883. Said indictment is numbered 1729 and styled The State of Texas v. Jesse Brothers, and is now on file among the papers of said cause No. 1729, and is here referred to and made part hereof. Defendant avers that afterwards, to wit, on the eighteenth day of February, 1886, said cause No. 1729, styled as aforesaid, came on for trial in the district court of Falls county and a jury was duly empaneled and sworn to try the issues raised between the State of Texas and defendant on the charges aforesaid contained in said indictment.

"That thereafter, to wit, on the same day, a trial of said cause No. 1729 was had before said jury empaneled as aforesaid, upon the merits thereof, and upon defendant's plea of not guilty to

the charges contained in said indictment, and upon a full hearing of the evidence both for and against this defendant, the said jury returned a verdict of not guilty, and judgment was rendered in said district court in accordance with said verdict, and this defendant was discharged. All of which proceedings in the progress and trial of said cause fully appear in the records of this court, and are here referred to and made part hereof. Now defendant avers that the said H. C. Osborne, whose yearling is alleged to have been stolen and from whose possession the same is alleged to have been taken in said indictment No. 1729, is the same H. C. Osborne from whose possession the yearling in this cause is alleged to have been taken, and that the said Mat Roberts named in said cause No. 1729, is the same Mat Roberts referred to and named in this prosecution. .

"And defendant avers that the taking of the yearling referred to in said cause No. 1729 and the taking referred to in this cause refer to and are part of one and the same transaction, and the theft and receiving referred to in said cause No. 1729 were committed, if at all, which is not admitted, at the same time and place. And so defendant avers that said two offenses charged in said cause No. 1729 are part of the one and the same transaction, and transpired, if at all, which is not admitted, at the same time and place, and that the parties whose ownership is violated are one and the same, except that in the prosecution now before the court the said H. C. Osborne is alleged to have held possession of the yearling alleged to have been stolen for J. W. Waters who is alleged to be the owner.

"All of which defendant is ready to verify," etc. This plea is sworn to.

The motion for new trial raised the questions discussed in the opinion.

*J. N. Wharton* and *Martin & Dickinson* for the appellant: We wish briefly to present some of the questions raised in this record. The action of the court in striking out defendant's plea of former acquittal is the first to which we shall call attention.

The plea alleges that the two offenses charged in the indictment upon which the acquittal was had and in the one now before the court are one and the same transaction, and an inspection of the first indictment contained in this record shows them to be the same in all respects, with one exception, which is also shown in the plea. The difference is this, and the court may

reasonably infer the ground upon which the demurrer was sustained when the difference is stated: The first indictment alleges the ownership and possession of the stolen animal to be in one H. C. Osborne. The second indictment, or the one under which the present prosecution is carried on, alleges that the taking was from one H. C. Osborne, who was holding the animal for one J. W. Waters, who is alleged to be the owner.

Then the question is presented, if the property of A B is in the possession of C D, who has other property of his own, and A B's and C D's properties are taken at one time by the same person, can the taker be convicted of stealing A B's property after an acquittal on a charge of stealing C D's?

That the possession of a person having the care, control and management of property is a sufficient title to support the allegation of ownership in prosecutions for theft is not an open question in this State, and an allegation of the general ownership of A B in the case supposed is unnecessary. Then, in the case at bar, under the first indictment the defendant could have been convicted of the theft of Waters's animal, the one on the taking of which the second prosecution is based, and it seems to us inevitably to follow that not only the plea of former acquittal as made by defendant would protect him, but the constitutional guaranty against a second jeopardy would interfere.

We have not overlooked the distinction between former acquittal and conviction more than once enunciated by this court, but we submit that it is only from a misconception of the principle involved that the exception to defendant's plea could have been sustained. If A B's and C D's horses are taken at the same time we recognize that a conviction of the taking of A B's horse would bar a prosecution for taking C D's, while an acquittal would not. But the reason of this result, to wit, that the doctrine of carving interposes when a conviction is had, and the legal impossibility of a conviction for the theft of A B's horse upon evidence of the theft of C D's, which applies when the defendant is acquitted, affords a clear demonstration. For if C D's relations to A B's horse be such that the taker might be convicted upon an indictment charging the theft of C D's horse, then the constitutional guaranty against twice being in jeopardy would interpose and could not be overridden by construction. And while the facts might appear a little more formidable if the former jeopardy had been invoked, yet, we submit, while it makes no difference what name may be given the paper, yet un-

der the case last supposed and as in the case at bar, since it is Osborne's possession which was really invaded, and as the allegation of his holding possession for Waters in the last indictment was wholly unnecessary, and as under the first indictment it was wholly immaterial whether the proof showed the taking of Osborne's own yearling or one he was holding for some other person, and as it was and could be but one offense, the plea styled a former acquittal is good. The real reason for sustaining the demurrer below as it illustrates our position, with pardon of this court, we will give:

The prosecution argued, and the trial judge adopted the same view, that the defendant could not be convicted under the indictment in this case upon the proof of the facts alleged in the former; therefore it is a different offense and the plea is bad.

The fallacy of this way of presenting the case is apparent when we consider that the test proposed is not the correct one, for the only question is, would the facts alleged in this prosecution be admissible in support of the charge contained in the former. Besides, while the premise in the view argued and adopted is correct, the conclusion that the offense charged is different is not a sequence. For it is only by an erroneous assumption of a difference in the legal ownership of the two animals, as understood in the Penal Code, that the proposition that two offenses are charged can be maintained. We submit there was but one ownership and one possession which could be invaded, and the case would be the same as if A B was tried for the theft of a black horse belonging to C D, and upon acquittal he should be indicted for the theft of a white horse belonging to C D, and it should appear that C D had both a black and a white horse taken at the same time and place. This surely would, at least under the doctrine of jeopardy, entitle the defendant to a discharge from the last prosecution.

The testimony as developed in the trial of this cause shows that H. C. Osborne was in the possession, management and control of the animal in question, and the indictment charges that Osborne was holding the animal for Waters and that it was taken without Osborne's consent.

We submit the second and third assignments of error are well made. The charge authorizes the jury without evidence to find testimony which, if true, would be a good defense, to be false although natural and probable. We submit the correct principle is announced in the charge asked and refused; that when an

explanation which is reasonable is made when the person charged is found in possession of stolen property, it devolves upon the State to prove its falsity. This is the formula in which the principle is almost invariably announced in the authorities of this State. Of course if the testimony offered by defendant shows the explanation to be false, then it could not be called reasonable or probable.

We think the descriptive averment in the indictment that the animal was a yearling is not met by proof that an animal ten to twelve months old is usually called a yearling when the testimony is uncontrovertible that an animal is not a yearling until it is twelve months old. A gelding is usually called a horse, but it is well settled that describing the animal as a horse would not be met by showing that the animal was not a horse, but is usually so called. That the animal was under a year old is not a disputed fact.

The verdict is not sustained by the evidence in several particulars. The want of consent to Roberts's taking, or that the taking from Osborne was fraudulent, was not proved by positive testimony, and, Osborne being on the stand, no inference ought to be indulged from dubious circumstances that he did not consent.

Osborne claimed the cattle and took them from the defendant, and there is testimony which tends to show that Osborne, when he found the cattle, said that he thought Roberts had eaten his cattle.

This is all the testimony that we call to mind bearing upon the want of consent and a fraudulent taking by Roberts, and several equally probable inferences might be drawn from these facts. But, waiving this question, there was absolutely no proof that Roberts ever had possession of the animal, or that he had it in his potential control. The trade between Roberts and defendant was made at the residence of Mrs. Williams, and the cattle at the time were in an old pasture belonging to Doctor Forbes, and, according to the testimony of one witness, it was a range sale. That actual or potential custody of the property is necessary before a charge of receiving stolen property from another can be successfully predicated is settled both on principle and authority, and the fact that Roberts told the defendant that the cattle were in the old Forbes pasture, and that they were found there by defendant, affords the only basis of the necessary

deductions that Roberts had ever taken the property, or that he had it in custody.

And, finally, the verdict finding that defendant knew at the time he got possession of the property that it had been stolen can find no other support than the assumption that defendant must have known that Roberts had stolen all the property he had ever claimed to own. That defendant knew Roberts, and bought from him certain cattle which defendant had seen in the old Forbes pasture, is the extent of the testimony to prove guilty knowledge.

It is true Roberts had made a purchase of some cattle of the same description at the house of defendant's mother, from one Webb when the defendant was about home. But the testimony does not show that the defendant had anything to do with that transaction, or had his attention called to the particular cattle bought by Roberts.

But if he did know of this transaction no unfavorable inference can legitimately be drawn from it. Defendant was a stranger to Osborne, and presumably did not know his stock, and, being a stranger to Webb, to implicate him it must be assumed that he knew both Webb and Roberts to be knaves, with no apparent reason to do so. So far as we are able to discern from the testimony, there is nothing in the connection of defendant with the cattle of which he was found in possession that savors of fraud, and particularly so when facts show, and the verdict finds, that defendant's only connection with them was through Roberts.

*J. H. Burts,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. Two counts were contained in the indictment; one for theft, and one for receiving stolen property knowing it to have been stolen,—the allegation as to description of the animal and possession being that it was "one certain yearling" taken from the possession of one Osborne, who was holding possession thereof for one J. W. Waters. Appellant was found guilty, upon the second count, for receiving the stolen property knowing it to have been stolen, and his punishment was assessed at two years in the penitentiary.

A motion was made to quash the second count in the indictment, and the one upon which defendant has been convicted, because said count does not specifically charge a theft of the

animal by Mat Roberts, from whom defendant is alleged to have received it knowing it to have been stolen, but simply charges in general terms that Mat Roberts had stolen said animal from Osborne, and that defendant received and fraudulently took the same into his possession from Mat Roberts, the same having been acquired by Mat Roberts in such manner as that the acquisition came within the meaning of the term *theft*. The objection is that the allegations were conclusions, rather than statements of facts essential to charge the crime of theft by Mat Roberts.

Is it essential to the validity of a charge for receiving stolen property that the count shall contain a direct, distinct and affirmative allegation of all the facts going to constitute theft against the original taker from whom it has been received? The pleader, it will be noted, has followed substantially Form No. 512, prescribed for receiving stolen property, in Willson's Criminal Forms, page 220. Under the great weight of authority, the form is unquestionably sufficient. (See 1 Whart., Precedents and Indictments, 4 ed., No. 450; 2 Archbold's Crim. Practice and Pleading, 8 ed., top p. 1425, side p. 474.)

Speaking of the offense of receiving stolen property, Mr. Bishop says of the indictment: "As in larceny so in receiving, the transaction is identified by the description of the stolen things and their ownership. The thing stolen must be described in the same manner as in larceny. The name of the thief is not identifying matter, and hence it need not be alleged. The owner's name is essential to identification; hence it must be stated if known. Commonly in England and in numbers of our States, the indictment does not aver from whom the stolen goods were received. Some of our American cases require it." (2 Bish. Crim. Prac., 3 ed., secs. 982, 983; and to the same effect see 1 Whart. Crim. Law, 8 ed., sec. 997.) In Texas it has been the rule that an indictment for receiving stolen property must allege the name of the owner of the property, if known, and the name of the person from whom received. (State v. Perkins, 45 Texas, 10.) Judge Willson's form is sustained by all *standard* authorities, and the count here complained of is in compliance with said form. It was not error to overrule the motion to quash. (Nourse v. The State, 2 Texas Ct. App., 304.)

After his motion to quash was overruled, defendant interposed a special plea of *autrefois acquit*, alleging that he had formerly been tried and acquitted of this same offense, and as exhibits to and parts of his plea he set out the former indictment and former

judgment of acquittal. A demurrer to this plea by the district attorney was rightly sustained by the court, the plea showing upon its face that there was not an identity of offenses in the two cases charged. (Wright v. The State, 17 Texas Ct. App., 152; Alexander v. The State, 21 Texas Ct. App., 406; Shubert v. The State, Id., 551.)

Defendant's third bill of exceptions was to a paragraph of the court's charge wherein the jury were instructed: "If you find defendant was in possession of said animal, and you find he made an explanation of such possession, you will inquire first to determine if the same was reasonable, natural or probable, and if you find it so, then, in order to convict the defendant on either count, you must find such explanation to have been false; and unless you so find beyond a reasonable doubt, you will find the defendant not guilty." The correct rule is that where a party in possession of property recently stolen gives an exculpatory explanation of his possession which is reasonable or probable, then the burden devolves upon the State to prove its falsity; otherwise he is entitled to be acquitted. (Johnson v. The State, 12 Texas Ct. App., 385; Sitterlee v. The State, 13 Texas Ct. App., 587; Irvine v. The State, Id., 499; Ross v. The State, 16 Texas Ct. App., 554; Miller v. The State, 18 Texas Ct. App., 34; Loving v. The State, Id., 459; Windham v. The State, 19 Texas Ct. Ap., 413.) .

We have given the statement of facts in this record our very careful consideration, and we do not believe the evidence as here shown sufficiently establishes defendant's knowledge of the fact that the animals he purchased from Roberts had been stolen by Roberts, so as to warrant a conviction for receiving stolen property knowing it to have been stolen. A hypothesis that he did not know that fact is, under the evidence as shown us, by no means unreasonable or improbable.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*